UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DANNY C. RODRIGUEZ, *as father and natural
guardian of J.R., an infant*,

                                        Plaintiff,

           - against -

United States of America,

                                        Defendant.
-------------------------------------------------------------x

**OPINION & ORDER
ON MOTION TO DISMISS**

No. 24-CV-9703 (CS)

Appearances:

Jeffrey D. Hummel
Burdo, Rubin & Sachs, Esqs.
Melville, New York
*Counsel for Plaintiff*

Mary Ellen Brennan
Assistant United States Attorney
Southern District of New York
New York, New York
*Counsel for Defendant*

Seibel, J.

        Before the Court is Defendant's Motion to Dismiss.  (ECF No. 28.)  For the following

reasons, the motion is GRANTED.

## I.        **BACKGROUND**

        For purposes of the motion, I accept as true the facts, but not the conclusions, set forth in

Plaintiffs' Amended Complaint, (ECF No. 14 ("AC")), as well as the medical records

incorporated therein.

A.    **Facts**

On December 18, 2021, J.R. was born at Phelps Hospital in Sleepy Hollow, New York. (ECF No. 30-6 ("Ex. F") at 253.)[1]  The following day, he was administered and passed an Auditory Brainstem Response ("ABR") test, which screens for issues with the inner ear and the neurological pathways for hearing.  (*Id.* at 256; ECF No. 30-3 ("Ex. C") at 24; AC ¶ 37; *see* ECF No. 33 ("P's Opp.") at 1 n.1.)  Although his routine screening tests revealed an elevated bilirubin level of 12.80,[2] he was discharged from the hospital on December 20, 2021, and his parents were directed to follow up with his pediatrician at Open Door Family Medical Center ("Open Door"), a federally funded facility, the following day.  (Ex. F at 251, 256; AC ¶ 8.)

During a telephone appointment with Open Door the following afternoon, J.R.'s mother expressed concern about the yellowing of his skin.  (ECF No. 30-2 ("Ex. B") at 4.)  Because J.R. continued to be jaundiced after presenting with elevated bilirubin levels at the hospital, the doctor at Open Door recommended that J.R.'s parents bring him back to the hospital that day or early the next morning for another bilirubin check.  (*Id.* at 5.)  J.R. underwent laboratory testing at Phelps Hospital later that afternoon, and the laboratory received his blood sample at approximately 4:45 p.m.  (*Id.* at 7.)

At approximately 6:00 p.m., Phelps Hospital called Open Door and informed a nurse there that the result of J.R.'s bilirubin level of 29.7 was "critical."  (*Id.*)  This result, however, "was not checked, for unknown reasons," until the following afternoon, at which point a provider at Open Door called J.R.'s mother and told her to immediately bring J.R. to the hospital.  (Ex. C

---

[1] The Court omits leading zeroes on the page numbers of the medical records submitted by Defendant.

[2] J.R.'s medical records list his "Transcutaneous Bilirubin" level as 15.3, and his "Neonatal Total Bilirubin" level as 12.80.

at 19; *see* Ex. B at 2.)  J.R.'s mother was told that if she could not get transportation to the hospital, she should call 911 to get J.R. to the emergency room.  (Ex. B at 2.)  J.R.'s mother took him to Northern Westchester Hospital ("NWH"), where doctors reported that he was "jaundiced but otherwise vigorous."  (Ex. C at 30.)  J.R. was diagnosed with severe hyperbilirubinemia (at this point 31.3) and received intensive phototherapy, IV hydration and a double volume exchange transfusion.  (*Id.* at 23, 34.)  On December 23, 2021, J.R.'s mother called Open Door with an "urgent" question about the lab results and reported that her son was in the neonatal intensive care unit.  (ECF No. 34-1 at 316.)  When called back, she expressed concern about the "delay from Lab results to when she was called," and a doctor at Open Door discussed the delay "at length" with J.R.'s parents.  (*Id.*)  Open Door's records indicate that J.R.'s parents "requested [a] meeting with [the] senior attending," (*id.*), but it is unclear whether this meeting took place.[3]

On December 25, 2021,  the doctors at NWH administered another ABR test "due to hyperbilirubinemia."  (Ex. C at 24.)  Despite having passed his initial ABR test six days earlier, J.R. failed this second ABR test in both ears.  (*Id.* at 24, 27.)  He did, however, pass his otoacoustic emissions test.[4]  (*Id.* at 27.)  NWH recommended that he undergo follow-up testing with audiology in a week.  (*Id.*)  J.R. was discharged from the hospital that same day, as his bilirubin levels had normalized.  (*Id.* at 18-19.)  J.R. had not shown any signs of encephalopathy, and his doctor said that encephalopathy was unlikely given that J.R. had not exhibited any symptoms thus far.  (*Id.* at 24.)  Nonetheless, the doctor advised that J.R. continue to be

---

[3] Although the records do not indicate how J.R.'s parents learned of the delay in receiving the results, they show that less than an hour before J.R.'s mother called Open Door, a doctor from NWH called Open Door to inquire about the "delay of care from date lab was done." (ECF No. 34-1 at 317.)

[4] This test measures the function of the outer hair cells in the ear, but does not measure a response from the auditory nerve.  (ECF No. 32 ("D's Mem.") at 4 n.2.)

monitored and recommended a follow-up with pediatric neurology. (*Id.*) J.R. was also referred to a new pediatrician, (*id.*), and after canceling J.R.'s scheduled follow-up appointment with Open Door, J.R.'s mother informed Open Door that she had found a different facility to care for him, (ECF No. 34-1 at 314).

On December 30, 2021, J.R. underwent a neurological evaluation. (ECF No. 30-5 ("Ex. E") at 238; AC ¶ 38.) The results of this evaluation were normal "with the exception of lack of elicited response/lateralization to the bell," and the neurologist noted that a formal audiological evaluation was necessary to assess J.R.'s hearing. (Ex. E at 240; AC ¶ 38.) The neurologist recommended a reevaluation of J.R.'s neurological status in three months, and her notes indicate that she discussed with J.R.'s parents "possible acute clinical manifestations of hyperbilirubin encephalopathy, currently rare incidence of chronic encephalopathy, BIND [bilirubin-induced neurologic dysfunction] and ANSD [auditory neuropathy spectrum disorder]." (Ex. E at 240.)

On January 21, 2022, J.R. returned to Phelps Hospital for a follow-up hearing screening. (ECF No. 30-4 ("Ex. D") at 163.) He again failed the ABR testing in both ears. (*Id.*; AC ¶ 39.) Although the AC alleges that "[t]here was no discussion as to the cause of these findings at this time," (AC ¶ 39), the "history" section of the results noted that J.R. had passed the hearing screening administered immediately after his birth, but that his mother reported that he had failed the repeat screening after he was hospitalized with jaundice at NWH, (Ex. D at 163). Additional testing was recommended, and J.R.'s parents scheduled a follow-up appointment for February 2022. (*Id.*)

On February 11, 2022, J.R. underwent a diagnostic ABR evaluation. (Ex. E at 182; AC ¶ 40.) The results demonstrated "[t]he presence of a large cochlear microphonic and absent ABR response, along with the presence of otoacoustic emissions," which "suggest[ed] auditory

neuropathy/dys-synchrony," a condition affecting "the neural processing of auditory stimuli." (Ex. E at 183; *see* AC ¶ 40.)  The audiologists' report explained that "[p]atients with this disorder may or may not respond to sounds appropriately and have difficulty understanding speech and language," and thus the "results of objective testing may or may not be a true indicator of a patient's hearing."  (Ex. E at 183; *see* AC ¶ 40.)  J.R. was referred to an ear, nose and throat specialist, and his parents were advised to repeat the ABR testing when he was three months old and to take him for behavioral audiological testing at six or seven months to confirm the results. (Ex. E at 183; *see* AC ¶ 40.)  The AC again states that "no one identified a cause of the infant's possible hearing loss at that time," (AC ¶ 40), but the "history" section of the evaluation discusses J.R.'s hospitalization for jaundice and the failed ABR exam at the conclusion of that hospitalization, (*see* Ex. E at 182).

On March 11, 2022, shortly before J.R. turned three months old, he returned for a repeat diagnostic ABR evaluation "to monitor suspected Auditory Neuropathy Spectrum Disorder (ANSD)," the results of which were largely similar to the results of the February evaluation and again "suggest[ed] auditory neuropathy/dys-synchrony."  (*Id.* at 202; *see* AC ¶ 41.)  In addition to noting that the "comprehensive ABR" that J.R. was administered a month earlier "revealed suspected ANSD," the "history" section of the audiology report again recounted that J.R. had initially passed ABR testing but failed after his hospitalization for jaundice.  (*See* Ex. E at 202.) J.R. was referred to Early Intervention for speech therapy services and "possible amplification pending behavioral audiological results."  (*Id.* at 203.)[5]  According to the report, J.R.'s mother

---

[5] Subsequent medical records suggest that "amplification" refers to hearing aids.  (*See* Ex. E at 241, 244.)

informed the audiologists that she already had an Early Intervention evaluation scheduled for later that month.  (*Id.*)

J.R. returned to Phelps Hospital for his first behavioral audiogram on August 3, 2022. (*Id.* at 218; AC ¶ 42.)  The results of this testing "revealed mildly elevated responses to speech and 500 Hz and moderately severe responses at l-4kHz," and the audiologist recommended that J.R.'s parents initiate the early intervention process for amplification and bring him back for a repeat evaluation in two to three weeks.  (Ex. E at 219; AC ¶ 42.)  The report comments state that J.R. "was diagnosed with a bilateral auditory-neuropathy spectrum disorder (ANSD) from an Auditory Brainstem Response (ABR) test at 3 months old"[6] and had been receiving monthly early intervention services for speech therapy.  (Ex. E at 218.)  The report further notes that J.R.'s parents had noticed that he responded to sounds and his name and babbled frequently. (*Id.*)

A repeat behavioral audiogram was conducted on August 19, 2022, the results of which were similar to the previous test "except that testing yielded improved responses by 15 dBHL at 2-4kHz."  (AC ¶ 43; *see* Ex. E at 231.)  The resulting recommendations were as follows: "1) [e]arly [i]ntervention referral to obtain amplification as soon as possible; 2) [f]ollow up with ENT regarding ANSD diagnosis as planned; 3) [c]ontinue current [early intervention] services as planned; [and] 4) [s]chedule an audiological assessment to continue behavioral testing and obtain ear specific information."  (Ex. E at 230.)

On October 27, 2022, J.R. returned to the neurologist for a follow-up.  (*Id.* at 241.)  After indicating that J.R. "present[ed] for f/u hyperbilirubinemia, development," the neurology report

---

[6] Plaintiff characterizes this statement as "erroneous[]," (P's Opp. at 7), because the report of the March 11, 2022 diagnostic ABR states that the results only "suggest[ed]" auditory neuropathy, (*see id.* at 16; Ex. E at 202).

states that J.R. had been "followed by multiple specialties," that he was receiving several types of therapy, and that his mother was seeking out a private speech pathologist because she believed the monthly speech therapy he had been receiving was "inadequate." (*Id.*)  It further notes that J.R. would "likely need hearing aids" and that "[h]e does have acoustic neuropathy but his hearing is preserved to some degree." (*Id.*)  In the "assessment" section, the neurologist reported "[a]uditory neuropathy, bilateral" and "[h]yperbilirubinemia." (*Id.* at 242.)  The AC alleges that it was not until this appointment that J.R.'s neurologist informed his parents that J.R.'s hyperbilirubinemia had likely caused permanent, irreversible hearing loss.  (AC ¶ 44.)

### B.    Procedural History

Plaintiff (J.R.'s father) presented an administrative tort claim to the U.S. Department of Health and Human Services ("HHS") by filing the SF-95 form required by the Federal Tort Claims Act ("FTCA").  (*See* AC ¶¶ 1, 4; ECF No. 14-1.)  This filing was dated May 3, 2024 and stamped as received on May 6, 2024.  (ECF No. 30-1.)  The claim presented in the SF-95 was that Open Door's failure to timely diagnose J.R.'s hyperbilirubinemia and refer him for treatment resulted in "coordination issues; need for speech therapy; need for physical therapy; need for occupational therapy; pain and suffering; and[] loss of enjoyment of life."  (ECF No. 14-1; ECF No. 31-1.)  HHS acknowledged receipt of the claim on August 5, 2024, but never issued a Notice of Final Denial.  (AC ¶¶ 5-6.)[7]

On December 17, 2024, Plaintiff filed the instant action.  (ECF No. 1.)  On June 4, 2025, Defendant filed a letter requesting a conference in anticipation of its motion to dismiss on the

---

[7] When a plaintiff files an administrative claim with the appropriate federal agency and does not receive a final determination from the agency within six months, the plaintiff may file an FTCA claim in federal court.  *See Vaughn of Fam. Atkins v. Admin. for Child. & Fams.*, No. 24-CV-2970, 2024 WL 3656593, at *3 (S.D.N.Y. July 31, 2024) (citing 28 U.S.C. § 2675(a)).

ground that Plaintiff's claim was untimely.  (ECF No. 11.)  The Court held a conference on July 1, 2025, during which it (1) granted Plaintiff leave to file an amended complaint and (2) set a briefing schedule for the motion to dismiss.  (*See* Minute Entry dated July 1, 2025.)  Plaintiff filed the AC on July 31, 2025, and the instant motion followed.

## II.     LEGAL STANDARD

### A.      Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[8]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded

---

[8] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679.

Deciding whether a complaint states a plausible claim for relief is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Id.*

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to

relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

### B.       Documents Properly Considered

When deciding a motion to dismiss under Rule 12(b)(6):

> a district court may consider the facts alleged in the complaint, documents
> attached to the complaint as exhibits, and documents incorporated by reference in
> the complaint.  Where a document is not incorporated by reference, the court may
> nevertheless consider it where the complaint relies heavily upon its terms and
> effect, thereby rendering the document integral to the complaint.  For a document
> to be considered integral to the complaint, the plaintiff must rely on the terms and
> effect of a document in drafting the complaint[;] mere notice or possession is not
> enough.  And even if a document is integral to the complaint, it must be clear on
> the record that no dispute exists regarding the authenticity or accuracy of the
> document, and it must be clear that there exist no material disputed issues of fact
> regarding the relevance of the document.

*United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021); *see Solano v. New

York*, No. 20-CV-1378, 2021 WL 4134793, at *3 (N.D.N.Y. Sept. 10, 2021); *170 Mercer LLC v.

Rialto Cap. Advisors, LLC*, No. 20-CV-2496, 2021 WL 1163649, at *2 (S.D.N.Y. Mar. 25,

2021).

In support of its motion, Defendant attached the medical records that Plaintiff submitted

in support of his administrative claim.  (*See* ECF No. 30.)  It is clear that Plaintiff relied on these

records in framing the AC, as the AC repeatedly references test results contained therein, and at

times even quotes language from these records verbatim.  (*Compare, e.g.*, AC ¶ 40, *with* ECF

No. 30-5 at 183.)  Indeed, "Plaintiff agrees that there is no need for the Court to convert

9

Defendant's motion into one under FRCP Rule 56 given the fact that Plaintiff relied upon the medical records attached as exhibits to this motion in framing the AC." (P's Opp. at 10.) The Court may therefore consider these records in analyzing the instant motion. *See Liu v. N.Y. State Dep't of Health*, No. 16-CV-4046, 2017 WL 3393944, at *4 (S.D.N.Y. Aug. 7, 2017) (considering medical records on 12(b)(6) motion where it was "abundantly clear that Plaintiff relied heavily on the records in drafting the Amended Complaint" and "explicitly quote[d] language from various documents in the record"), *appeal dismissed sub nom.*, *Liu v. William F. Ryan Cmty. Health Ctr.*, No. 17-2820, 2018 WL 1276744 (2d Cir. Jan. 11, 2018).

Further, in support of its reply to Plaintiff's opposition, Defendant filed additional medical records that were not attached to Plaintiff's administrative claim, but which HHS obtained from Open Door as part of the Department's investigation into the administrative claim. (*See* ECF No. 34; *see also* ECF No. 37 ("D's Reply") at 5 n.1.) Although it does not appear that Plaintiff relied on these records in drafting the AC such that they should be considered integral or incorporated by reference, Plaintiff, on consent of the Government, (D's Reply at 5 n.1), and with the Court's permission, (ECF No. 40), filed a sur-reply in which he addressed these additional records, (ECF No. 41 ("P's Sur-reply")). Although Plaintiff contended that "this evidence still falls far short of meeting Defendant's burden," he did not object to the Court's consideration of the additional records. (*Id.* at 1.)

Because the additional records are not mentioned in the AC and Plaintiff did not rely on them in framing his claims, they ordinarily are not properly considered on a motion to dismiss. *See, e.g., Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). But when matters outside the pleadings are presented on a motion under Rule 12(b)(6), the motion to dismiss may be converted to a motion for summary judgment under Federal Rule of Civil Procedure 56. *See*

10

Fed. R. Civ. P. 12(d); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991). A court may exercise its discretion to convert "provided that the court gives 'sufficient notice to an opposing party and an opportunity for that party to respond.'" *Mathie v. Dennison*, 381 F. App'x 26, 26 (2d Cir. 2010) (summary order) (quoting *Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995)). But "under certain circumstances, a court may convert a motion without giving explicit notice." *Metrokane, Inc. v. Wine Enthusiast*, 185 F. Supp. 2d 321, 325 (S.D.N.Y. 2002); *see Fiore v. Univ. of Tampa*, 568 F. Supp. 3d 350, 369 n.14 (S.D.N.Y. 2021). "The essential inquiry is whether the [opposing party] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of reasonable opportunity to meet facts outside the pleadings." *Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999); *see Villante v. Dep't of Corr.*, 786 F.2d 516, 521 (2d Cir. 1986); *Fiore*, 568 F. Supp. 3d at 369 n.14; *Metrokane, Inc.*, 185 F. Supp. 2d at 325. Here, Plaintiff was on notice that Defendant was relying on the additional records, did not object to the Court's considering them, had the opportunity to address them in his sur-reply, and did so. Therefore, as to the issue of these records only, I convert the motion to one for summary judgment. *See Reliance Ins. Co. v. Polyvision Corp.*, 474 F.3d 54, 57 (2d Cir.) (conversion proper where opposing party aware that additional factual material was being considered and did not object), *certified question answered*, 9 N.Y.3d 52 (2007).

## III.    DISCUSSION

Under to the FTCA, before a plaintiff can bring a claim against the United States for personal injury caused by the negligent or wrongful act or omission of a federal employee, he must "have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing." 28 U.S.C. § 2675(a). The FTCA further provides

that an FTCA claim "shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." *Id.* § 2401(b). This two-year statute of limitations is not jurisdictional and may be equitably tolled in rare and exceptional circumstances. *United States v. Wong*, 575 U.S. 402, 420 (2015); *see A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011) ("[E]quitable tolling is considered a drastic remedy applicable only in rare and exceptional circumstances.").

"Although liability under the FTCA is predicated on state law, federal law governs when a claim accrues for purposes of the two-year limitations period." *Neuenswander v. United States*, 422 F. Supp. 2d 425, 433 (D. Vt. 2006); *see A.Q.C.*, 656 F.3d at 139. "Ordinarily, a plaintiff's FTCA claim accrues at the time of injury." *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998); *see A.Q.C.*, 656 F.3d at 139. If, however, "a plaintiff 'would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called "diligence-discovery rule of accrual" applies.'" *A.Q.C.*, 656 F.3d at 140 (quoting *Kronisch*, 150 F.3d at 121). Under this rule, the accrual date is "the time when, with reasonable diligence, the plaintiff has or should have discovered the critical facts of both his injury and its cause"; has reason to suspect that the injury was iatrogenic (meaning caused by medical treatment); and "knows, or should know, enough to protect himself by seeking legal advice." *Id.* Although an FTCA claim does not arise out of a "mere hunch, hint, suspicion, or rumor of a claim," *Kronisch*, 150 F.3d at 121, "[d]iscovery of the critical facts of injury and causation is not an exacting requirement, [and] requires only knowledge of, or knowledge that could lead to, the basic facts of the injury," *A.E.F. v. United States*, No. 13-CV-285, 2014 WL 2453300, at *3 (W.D.N.Y. June 2, 2014).

**A.** **Knowledge of Injury**

Plaintiff argues that he was not aware of J.R.'s injury until J.R. was formally diagnosed with hearing loss in August 2022. (*See* P's Opp. at 1, 17.) Defendant, on the other hand, argues that J.R.'s injury was apparent as early as December 2021, when J.R. was hospitalized and treated for severe hyperbilirubinemia and failed the ABR test administered immediately thereafter. (D's Mem. at 13-14.)

The Court is not convinced that J.R.'s parents should have surmised from his December 2021 hospitalization that their son had been injured. "Where a claim of medical malpractice is based on the failure to diagnose or treat a pre-existing condition, the injury is the development of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment." *Neuenswander*, 422 F. Supp. 2d at 433-34; *see Torres v. United States*, No. 12-CV-6011, 2014 WL 4805035, at *5 (E.D.N.Y. Sept. 26, 2014), *vacated on other grounds and remanded*, 612 F. App'x 37 (2d Cir. 2015) (summary order). Thus, "[i]n this type of case, it is only when the patient becomes aware or through the exercise of reasonable diligence should have become aware of the development of a pre-existing problem into a more serious condition that his cause of action can be said to have accrued for purposes of [the FTCA]." *Neuenswander*, 422 F. Supp. 2d at 434; *see Williams v. United States*, No. 03-CV-9909, 2007 WL 951382, at *6 (S.D.N.Y. Mar. 22, 2007). Accordingly, the relevant injury for the purposes of this action is not J.R.'s hyperbilirubinemia, which he had already developed by the time he underwent laboratory testing on December 21, 2021, (*see* Ex. B at 7) – rather, the injury is whatever consequences J.R. suffered (here, allegedly, auditory neuropathy and hearing loss) from Open Door's failure to timely diagnose and report hyperbilirubinemia. And because J.R. would likely have required treatment for his hyperbilirubinemia even if Open Door had

13

immediately alerted his parents to his condition, his December 2021 hospitalization and treatment would not have put his parents on notice of any additional injury caused by Open Door's alleged negligence.

Although a closer call, the Court does not find that the failed ABR exam administered during this hospital visit and the results of J.R.'s subsequent neurological evaluation sufficed to charge J.R.'s parents with notice of his injury. The fact that J.R. had passed his first ABR exam prior to his hospitalization and then failed the same exam immediately thereafter, combined with his failure to respond to the bell during his neurological exam, may well have been a red flag. Nonetheless, the neurologist deferred to the audiologist with regard to evaluation of J.R.'s hearing, and told his parents that auditory neuropathy was a possible but "rare" consequence of hyperbilirubinemia. (Ex. E at 240.) At this point, it arguably would not have been unreasonable for J.R.'s parents to write off J.R.'s failed ABR exam and lack of response to the bell as coincidental or otherwise unrepresentative of J.R.'s hearing and auditory processing, particularly given that his providers did not yet appear to believe that he had suffered serious damage. But the neurologist's explanation that auditory neuropathy was a possibility, even if not a likely one, would surely have informed their understanding of further testing.

On the other hand, the Court does not agree with Plaintiff's position that J.R.'s parents were not aware of any injury until August 2022. "To be aware of an injury, plaintiff need not know the full extent of his or her injury," and "[t]he statute will run even though the ultimate damage is unknown or unpredictable." *Mendez by Martinez v. United States*, 655 F. Supp. 701, 705 (S.D.N.Y. 1987); *see Jensen v. United States*, No. 22-CV-1116, 2025 WL 722904, at *7 (E.D.N.Y. Mar. 6, 2025) ("A plaintiff is not required to know each and every relevant fact of [his] injury or even that the injury implicates a cognizable legal claim."); *see also Cannon v.*

14

*United States*, 338 F.3d 1183, 1190 (10th Cir. 2003) ("For FTCA purposes, a claimant is aware of the injury once apprised of the general nature of the injury.  Lack of knowledge of the injury's permanence, extent, and ramifications does not toll the statute.").  Thus, "[a] plaintiff simply may not postpone bringing an action until the full extent of th[e] damage is ascertained." *J.D. ex rel. Doe v. United States*, No. 10-CV-4296, 2011 WL 292010, at *8 (S.D.N.Y. Jan. 28, 2011), *aff'd sub nom.*, *Dominguez ex rel. Dominguez v. United States*, 468 F. App'x 23 (2d Cir. 2012) (summary order); *see Mendez*, 655 F. Supp. at 705 (purpose of diligence-discovery rule is to permit plaintiffs to inquire about a potential legal claim once they are aware of injury, and "to stimulate such inquiry, plaintiff need not know the full extent of the damage, but just that some serious harm has occurred").

Between December 25, 2021 and March 11, 2022, J.R. failed each of the four ABR tests he was administered.  (AC ¶¶ 37, 39-41.)  Although his providers recommended further testing after each of these failed exams, it was apparent by early 2022 that something was wrong. Indeed, while Plaintiff insists that "[i]t is beyond dispute that the records make clear that J.R.'s parents thought that he did not have any hearing loss," (P's Opp. at 17), his mother had already scheduled an appointment to begin Early Intervention therapy by March 2022, (Ex. E at 203). And J.R. was first referred for speech therapy – one of the injuries for which Plaintiff sought relief in his administrative claim, (*see* ECF No. 31-1) – that same month, (Ex. E at 203).  *See J.D. ex rel. Doe*, 2011 WL 292010, at *8 (noting that the conditions listed in notice of claim were apparent months before plaintiff received a formal diagnosis).

Plaintiff makes much of the notation in the February 2022 audiological report indicating that patients with auditory neuropathy "'***may or may not*** respond to sounds appropriately and have difficulty understanding speech and language;' [and] thus, '***results of objective testing may***

15

***or may not be a true indicator of a patient's hearing*.'"** (P's Opp. at 6 (emphases in original) (quoting Ex. E at 183).)  According to Plaintiff, this statement "undercut the[] significance" of the audiologist's findings.  (*Id.* at 16.)  I disagree.  First, that statement was preceded by the finding that the test results, including "absent ABR response," "suggest[ed] auditory neuropathy/dys-synchrony."  (*Id.* at 6, 16.)  A caveat that the results were not definitive does not undermine the strong signal – especially after the numerous failed tests – that J.R.'s hearing could well be affected.  Moreover, Plaintiff does not address the fact that auditory neuropathy is itself an injury.  In other words, even if the failed tests reflected deficiencies in "neural processing of auditory stimuli" (*i.e.*, auditory neuropathy) rather than an inability to hear at all, it was undeniable that some form of deficiency was present.  Thus, it was apparent by this point that J.R. had suffered an injury, even if the extent or details of the injury were unclear.  *See Torres*, 2014 WL 4805035, at *5 (claim accrued when plaintiff became aware that she had been injured by defendant's purported failure to diagnose her condition, even if she was not yet aware of the full extent of the harm caused or that she would suffer further complications).

Similarly, Plaintiff stresses that the reports from J.R.'s diagnostic ABR evaluations only state that the results "suggest[]" auditory neuropathy, and that J.R. would need to undergo repeat testing when he was six or seven months old to "confirm" the results.  (P's Opp. at 16; Ex. E at 183, 202.)  But where it is clear that some injury has occurred, the lack of a formal diagnosis is immaterial.  *See L.C.H. ex rel. Hagan v. United States*, No. 12-CV-916, 2012 WL 6570685, at *1-2, *6 (D.D.C. Dec. 14, 2012) (claim accrued when infant suffered a stroke and subsequent testing demonstrated brain tissue death even though ultimate diagnosis of hypoxic ischemic encephalopathy was not made until years later); *J.D. ex rel. Doe*, 2011 WL 292010, at *7-8 (parents' awareness that infant had suffered brain damage and showed signs of developmental

16

delays was sufficient to establish knowledge of injury even though infant was not ultimately diagnosed with cerebral palsy until months later); *Mendez*, 655 F. Supp. at 705-06 (awareness of infant's severe injury and "possible brain damage" began running of limitations period, even though parents did not discover damage to intellectual functioning until years later). As discussed above, it is apparent from J.R.'s repeated failed ABR exams and the fact that his mother had already begun seeking Early Intervention treatment that his parents knew that some injury had occurred by March 2022 at the latest. Accordingly, the lack of a formal diagnosis did not prevent the claim from accruing.[9]

### B.      Knowledge of Causation

In addition to being aware that J.R. had suffered an injury, Plaintiff must also have had reason to suspect that this injury was "related in some way to the medical treatment [J.R.] received" in order for the claim to accrue. *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 177 (2d Cir. 2008); *see G.A.P. by Pungello v. United States*, No. 24-CV-152, 2024 WL 5047738, at *8 (S.D.N.Y. Dec. 9, 2024). In other words, "[t]he notice must be not of harm but of iatrogenic [doctor-caused] harm, though . . . not necessarily of *negligent* iatrogenic harm." *Valdez ex rel. Donely*, 518 F.3d at 177 (emphasis in original).

---

[9] J.R.'s August 2022 medical records note that he "was diagnosed with a bilateral auditory-neuropathy spectrum disorder (ANSD) from an Auditory Brainstem Response (ABR) test at 3 months old," (Ex. E at 218) – *i.e.*, in March 2022. As discussed above, Plaintiff disagrees with this statement and insists that no formal diagnosis was made until August. (P's Opp. at 7, 17.) From J.R.'s medical records, it is not clear when the diagnosis was actually made, but it appears that the recommended repeat testing after J.R. had turned six months of age may have simply been confirmatory rather than diagnostic. (*See* Ex. E at 183, 202-03, 218.) Nonetheless, because the date of formal diagnosis is immaterial for the reasons discussed above, the Court need not address this issue further. *See Bohrer v. City Hosp., Inc.*, 681 F. Supp. 2d 657, 665 (N.D. W. Va. 2010) (the fact that cerebral palsy cannot be diagnosed before two years of age was immaterial because "the FTCA inquires as to injury – not as to diagnosis or full extent of injury").

Plaintiff argues that even if J.R.'s parents should have suspected that he had hearing loss, "there was no reason for them to have suspected that there was any link to his hyperbilirubinemia." (P's Opp. at 16.) In support of this argument, Plaintiff contends that J.R.'s neurologist "had earlier pointed them away from such a conclusion," that "no other physician advised them of anything to the contrary," and that "[t]he records are devoid of any indication that J.R.'s medical providers or his parents suspected that his severe hyperbilirubinemia and potential hearing loss were related to Open Door's medical care in any way." (*Id.* at 16-17.)

As to Plaintiff's first contention, J.R.'s neurologist noted that she and J.R.'s parents "discussed possible acute clinical manifestations of hyperbilirubin encephalopathy, currently rare incidence of chronic encephalopathy, BIND and ANSD" during the December 2021 appointment. (Ex. E at 240.) Plaintiff alleges that this conversation "reasonably directed [J.R.'s parents] away from consideration that [J.R.]'s potential hearing loss could be related to hyperbilirubemia." (AC ¶ 38.) But while "plaintiffs seeking to understand the cause of an injury may reasonably rely on advice and assurances by doctors," *Chamness by & Through Chamness v. United States*, 835 F.2d 1350, 1353 & n.8 (11th Cir. 1988) (collecting cases), there is no indication that J.R.'s doctor assured his parents that no injury had occurred or that the injury could not have been iatrogenic. To the contrary, the neurologist flagged for J.R.'s parents that hyperbilirubemia can, albeit in rare circumstances, cause the kind of complication that J.R. suffered.

Similarly, while Plaintiff avers that there is nothing in J.R.'s records indicating that his doctors suspected that his injury was related to his hyperbilirubemia or conveyed such a suspicion to J.R.'s parents, the medical records themselves undermine this argument. For example, Plaintiff's records from NWH state that although J.R. had passed his initial ABR test,

18

on December 25, 2021 he was given a repeat test "due to hyperbilirubinemia." (Ex. C at 24.)[10] Even if the disparity between the results of J.R.'s ABR tests did not conclusively establish that the hyperbilirubinemia had damaged his hearing or auditory processing at this early stage, his parents were advised to monitor him for signs of encephalopathy and to follow up with neurology and audiology. (*Id.*) Moreover, after J.R. failed this test, each of his subsequent audiology evaluations described his hospitalization for hyperbilirubinemia in the "history" section of the corresponding reports, (Ex. D at 163; Ex. E at 166, 182, 202), which suggests that his doctors connected his hyperbilirubinemia to his subsequent failed ABR exams. In sum, the temporal proximity between J.R.'s hospitalization for hyperbilirubinemia and his first failed ABR exam, combined with the recommendation from J.R.'s doctors that he undergo further testing, the neurologist's warning that auditory dysfunction was a potential consequence of hyperbilirubinemia, and the fact that J.R. failed every ABR test thereafter, should have alerted J.R.'s parents to the connection between his hyperbilirubinemia and subsequent medical issues.

As discussed above, the relevant inquiry is not simply whether J.R.'s parents were aware that the hyperbilirubinemia itself harmed him, but rather whether they had reason to believe that Open Door's failure to timely alert them to the need to seek treatment resulted in injury. In Plaintiff's opposition, he argued that nothing in J.R.'s records "indicates that his parents were

---

[10] Plaintiff argues that it is "[s]ignificant[]" that J.R. was "***tested for cytomegalovirus ('CMV') 'due to failed hearing screen***,'" as this testing may have caused J.R.'s parents to infer that his potential hearing loss was unrelated to hyperbilirubinemia. (P's Opp. at 4 (emphases in original) (quoting Ex. C at 26).) From the records, however, it appears that CMV was considered as an underlying cause of the hyperbilirubinemia itself. (*See* Ex. C at 24 (noting that CMV is a "potential cause of jaundice in neonate").) In other words, it does not appear that CMV was considered as a cause of the hearing loss instead of hyperbilirubinemia, but rather that CMV may have caused the hyperbilirubinemia, which then ultimately led to the hearing loss. Regardless, however, the CMV test was negative, (Ex. C at 18), and the Court is unconvinced that J.R.'s parents could have reasonably believed that hyperbilirubinemia was not a possible cause of hearing loss simply because J.R.'s doctors also tested him for other conditions.

made aware that Open Door had failed to timely act when [his] bilirubin result was received" or that "they had any knowledge as to how long it would or should take for that test to be resulted and reported." (P's Opp. at 12-13.) But as Plaintiff ultimately concedes in his sur-reply, records from Open Door indicate that J.R.'s parents called within a week of his hospitalization to ask why there was a delay between Open Door's receipt of lab results and their being contacted, requested to speak to a senior attending, and informed Open Door that J.R. would not be returning and would instead by seen by a new pediatrician. (*See* P's Sur-reply at 3 (referencing ECF No. 34-1 at 314-17).) The records further show that J.R.'s doctor was concerned about the delay in advising the parents of the "critical" test result. (*See* ECF No. 34-1 at 317.) While Plaintiff argues that this is insufficient to establish that J.R.'s parents were advised that the delay in treatment "impacted J.R.'s treatment in any way, let alone caused him any injury," (*id.* at 3), "the statute of limitations begins to run when a reasonably diligent person (in the tort claimant's position) reacting to any suspicious circumstances of which he might have been aware would have discovered that the injury may be related to the medical care," *J.D. ex rel. Doe*, 2011 WL 292010, at *8.

By December 2021, J.R.'s parents knew that his bilirubin level had shot up between his release from Phelps and the repeat test the next day, and that Open Door had delayed in alerting them to this "critical" information. (*See* Ex. B at 2; ECF No. 34-1 at 316.) They contacted Open Door to express concern about this delay and subsequently removed J.R. from Open Door's care. That same month he had been hospitalized for several days and they were informed that hyperbilirubinemia can lead to serious complications, including audiological and neurological issues. By March 2022, J.R. had failed every ABR test after his hospitalization, his doctors suspected auditory neuropathy, and his mother had begun to seek out Early Intervention therapy.

Taken together, these circumstances demonstrate that J.R.'s parents had "sufficient information to have strong suspicions of iatrogenic harm," thus giving rise to a duty to inquire into the possible existence of a claim and triggering the statute of limitations. *J.D. ex rel. Doe*, 2011 WL 292010, at *8-9; *see G.A.P. by Pungello*, 2024 WL 5047738, at *8 (plaintiffs did not need to "determine the precise cause of [their child's] injury to have reason to suspect that it was potentially caused by medical malpractice").

In short, by March J.R.'s parents knew that as of December 21, 2021, their son's bilirubin levels were severely elevated and required emergency attention; that Open Door had failed to inform them of those facts until the next day; that J.R. had required several days of treatment to reduce his bilirubin levels; that hyperbilirubinemia such as J.R. had suffered can cause hearing loss; and that J.R. likely had auditory neuropathy and suffered such loss. Accordingly, the claim accrued, at the latest, by March 2022. Because the administrative claim was not filed until May 2024, it was untimely.

The Court sympathizes with J.R.'s parents, and understands that pursuing a lawsuit may have been far from the front of their minds while navigating their son's medical issues. But "statutes of limitation oftentimes render harsh results," *L.C.H. ex rel. Hagan*, 2012 WL 6570685, at *7, and "[b]ecause the FTCA is an instance of the waiver of sovereign immunity, its terms and limitations must be strictly construed and applied," *Hunter v. United States Postal Serv.*, No. 19-CV-2572, 2020 WL 804946, at *2 (E.D.N.Y. Feb. 18, 2020), *appeal withdrawn*, No. 20-1387, 2020 WL 6267968 (2d Cir. Sept. 23, 2020). Thus, because Plaintiff failed to file his administrative complaint within two years of accrual, the claim is barred.[11]

---

[11] Plaintiff has not argued that equitable tolling should apply to his claim, and the Court agrees with Defendant that this case does not present the "'rare and exceptional

21

## IV.     **LEAVE TO AMEND**

Leave to amend a complaint should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "[I]t is within the sound discretion of the district court to grant or deny leave to amend."  *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018).  "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons.  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended his complaint after having the benefit of Defendant's pre-motion letter, (ECF No. 11), and the discussion at the July 1, 2025 pre-motion conference, (*see* Minute Entry dated July 1, 2025).  In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend.  *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first.  Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*."); *see also Baines v. Nature's Bounty (NY), Inc.*, No. 23-CV-710, 2023 WL 8538172, at \*3 (2d Cir. Dec. 11, 2023) (no abuse of discretion where plaintiffs "already amended their complaint once in the face of a pre-motion letter from Defendants," and then "requested leave to amend again in a single, boilerplate sentence without specifying what allegations they could add or how amendment would cure any deficiencies"); *Bardwil Indus. Inc. v. Kennedy*, No. 19-CV-8211, 2020 WL 2748248, at \*4 n.2

_____

circumstance[s]'" that would warrant application of that doctrine.  (D's Mem. at 17 (quoting *A.Q.C.*, 656 F.3d at 144).)

22

(S.D.N.Y. May 27, 2020) (dismissing with prejudice where plaintiff amended following pre-motion letters and pre-motion conference that identified the deficiencies resulting in dismissal).

Moreover, Plaintiff has not asked to amend again or otherwise suggested that he is in possession of facts that would cure the deficiencies identified in this decision. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if [he] fails to specify . . . how amendment would cure the pleading deficiencies in [the] complaint."); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice "in the absence of any indication that [plaintiff] could – or would – provide additional allegations that might lead to a different result . . . ."); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make complaint viable and plaintiffs did not request leave to amend); *GateGuard, Inc. v. Amazon.com Inc.*, No. 21-CV-9321, 2023 WL 2051739, at *21 (S.D.N.Y. Feb. 16, 2023) (denying leave to amend where plaintiff "already amended its complaint in response to [Defendant's] pre-motion letter detailing the bases for its anticipated motion to dismiss" and did not seek leave to amend again). Indeed, the problem with the claim "is substantive" and "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see Mansour v. Stanley*, No. 25-CV-7633, 2026 WL 636874, at *13 (S.D.N.Y. Mar. 6, 2026) (leave to amend would be futile because "dismissal rests on fundamental legal barriers – including the expiration of the applicable statutes of limitations – that cannot be remedied through additional factual allegations"), *appeal filed*, No. 26-600 (2d Cir. Mar. 11, 2026).

Accordingly, the Court declines to grant leave to amend *sua sponte*.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss is GRANTED.  The Clerk of

Court is respectfully directed to terminate the pending motion, (ECF No. 28), and close the case.

**SO ORDERED.**

Dated: May 19, 2026
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.